Owen G. Anderson and Carol T. Anderson, et al. [1]
Anderson v. Commissioner
Docket Nos. 6647-66 - 6658-66, 6712-66, 2544-67, 3215-67 - 3218-67.
United States Tax Court
T.C. Memo 1970-271; 1970 Tax Ct. Memo LEXIS 10; 29 T.C.M. (CCH) 1193; T.C.M. (RIA) 70271; September 23, 1970, Decided *10 Charles W. Davis, Edward W. Rothe, Robert T. Wray, Lewis E. Striebeck, Jr. and Frederic L. Hahn, Suite 5200, One First Nat'l Plaza, Chicago, Ill., for the petitioners. Somers T. Brown, Ernest J. Wright and Paul Pineo, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined the following income tax deficiencies in these consolidated cases (the petitioner wives, or their estates are parties herein only by virtue of filing joint returns. The petitioner husbands, or their estates, will hereinafter be referred to as "petitioners"): In the case of William F. Souder, Jr., et al., docket No. 6658-66, respondent also determined a deficiency of $57,924.51 for the taxable year ending 12/31/59. The petition in that case alleged no error as to that deficiency but made this statement: "The petitioners having executed and filed a form 870 with the respondent waiving restrictions on assessment of the 1959 deficiency the deficiency is not in dispute here." The respondent in his answer admitted "the allegations of paragraph 3 of petition, except it is denied that the petitioners having executed and filed a form 870 with the respondent waiving restrictions on the assessment *11 of the 1959 deficiency, the deficiency is not in dispute here." No further reference has made by the parties to this matter in the 1195 pleadings, the testimony or the briefs. Accordingly we have not considered it in this Opinion. Certain issues involving small amounts of the proposed deficiencies have been disposed of by agreement of the parties. The remaining issues presented concern the tax consequences of the acquisition by each petitioner, during 1960 and 1961, of stock in the insurance agency and brokerage firm of Marsh & McLennan, Incorporated (hereinafter sometimes referred to as "Marsh & McLennan" or the "Company"). All of the petitioners were officers or employees of March & McLennan. Most of the petitioners acquired their stock through the exercise of stock options granted by the Company, but some of the petitioners acquired their stock by purchase from other officers and one acquired shares by purchase directly from the Company. During those years, all of Marsh & McLennan's stock was closely held and beneficially owned by selected officers and employees [2] under the provisions of a Voting Trust and of a Stockholders Agreement which instruments contained provisions imposing *12 certain restrictions on stock transfers and certain conditions with regard to the sale and repurchase of the stock by the Company. Both the Voting Trust and the Stockholders Agreement were terminated in 1962 in order to permit a public offering of Marsh & McLennan stock. This offering was at a price considerably in excess of the price paid by petitioners to acquire the stock during the preceding years. At the time when petitioners were granted options and acquired the stock there was no intention on the part of the corporation or its officers to "go public." 1194 Petitioner
Docket No.
Legal Residence at Deficiencies
Time Petition Filed
Determined
1961
1962
1960
Anderson
6647-66
Crystal Lake, Ill.
$ 10,095.26
$ 58,054.65
Garnett 6648-66
Loretto, Virginia
53,907.85
2544-67
376,741.61
Houck
6649-66
Oak Park, Virginia
12,771.33
2,971.02
82,260.28
James
6650-66
Chicago, Illinois
10,466.29
76,554.13
Moore
6651-66
Chicago, Illinois
9,287.28
56,332.17
Morey
6652-66
Winnetka, Illinois
91,851.34
2,068.71
505,936.92
Orloff
6653-66
Chicago, Illinois
10,396.60
44,603.03
Regan
6654-66
Bedford Hills, N.Y.
9,682.47
58,230.75
Sinnott
6655-66
Chappaqua, New York
9,339.36
8,867.23
118,350.56
Sked
6656-66
Lake Forest, Ill.
10,450.29
58,821.63
Smith
6657-66
Lake Forest, Ill.
69,859.89
2,613.77
221,412.26
Souder
6658-66
New York, N.Y.
10,818.33
15,165.25
154,098.47
Watkins
6712-66
Chicago, Illinois
27,799.15
180,860.93
Hoagland
3215-67
Verona, New Jersey
49,702.55
Leftwich
3216-67
Fair Haven, N.J.
45,629.00
Nelson
3218-67
Upper Montclair, N.J.
77,987.80
*13 1195 The respondent's basic determination is that the stock acquisitions are to be taxed in the year in which the Voting Trust and Stockholders Agreement were terminated (1962). If this determination is not upheld, respondent has determined alternative deficiencies in the year the stock was acquired. [3] For that reason there are duplications of deficiencies to the extent that the lower determinations in the year 1960 and 1961 relate to the same stock on which the higher determinations were made for the year 1962. All of the 1962 deficiencies determined by respondent were made within the three year statute of limitations period of section 6501(a), I.R.C. 1954[4] as extended by agreement of the parties pursuant to section 6501(c)(4), but none of the proposed 1960 or 1961 deficiencies were determined during this period With respect to the proposed 1960 and 1961 deficiencies, respondent has the burden of proof because he relies on the six year statute of limitations of section 6501(e). *14 The major issues presented for our decision are the following: (1) Whether the stock options involved were statutory "restricted stock options" under section 421 and 424, I.R.C. 1954 (formerly section 421 during the years 1960 and 1961), i. e. whether the option prices for Marsh & McLennan stock were at least 85% of the fair market value of the stock when the options were granted in 1960 and 1961. If we decide issue (1) in the negative, the following issues remain for our decision: (2) Whether Reg. section 1.421-6(d)(2) - which provides that the taxable event occurs when the restrictions lapse and measures the amount of compensation by the difference between the option prices and the fair market value of the stock without restrictions (either as of the time of acquisition or of the lapse of the restrictions, whichever is lower) - is applicable to the facts of this case and, if so, whether it is a valid regulation. (3) If the regulation is applicable and valid, what was the amount of taxable income received by each taxpayer in 1962 when the Voting Trust and the Stockholders Agreement were terminated, i. e. what was the difference between the option price and the fair *15 market value of the stock without restrictions, on each of the dates of exercise in 1960 and 1961. [5] In connection with this issue, the parties differ as to whether it is to be assumed that all of Marsh & McLennan's stock was unrestricted rather than only the stock acquired by each petitioner or by all of the petitioners in these proceedings. (4) If the regulation is invalid or inapplicable, what was the amount of 1196 taxable income received by each petitioner in 1960 and 1961, i.e. what was the difference between the option price and the fair market value of the stock, with restrictions, on each of the dates of exercise in 1960 and 1961. [6]
(5) Whether the stock acquisitions which did not involve stock options were taxable compensatory bargain purchases, and, if so, whether the tax treatment of these stock acquisitions is governed *16 by Income Tax Reg. section 1.61-2(d)(5). (6) If it is determined that taxable income was received by the petitioners in 1960 or 1961, then did each petitioner, or any of them, omit an amount exceeding 25 percent of his gross income in those years so that the period of limitations on the assessment and collection of the tax for those years has not expired under the provisions of section 6501(e). With regard to all factual questions incident to the proper valuation to be made of the Marsh & McLennan stock in considering issues 4 and 6 supra it is conceded that the burden of proof is on respondent. Petitioners contend that the burden of proof with regard to the valuation of the Marsh & McLennan stock is also on respondent with regard to other issues because the determinations of deficiency relating to 1962 were arbitrary and grossly erroneous with regard to the fair market values of the stock used by him in such determinations. Findings of Fact Some of the facts and exhibits have been stipulated and are incorporated herein by this reference. During the taxable years in issue each petitioner was an officer-employee of Marsh & McLennan, Incorporated, a Delaware corporation. *17 Their residences at the time their petitions were filed are listed above. All returns for the years in issue were filed on a calendar year basis and all petitioners were cash basis taxpayers in those years. Each return was filed with the appropriate office of the Internal Revenue Service. Marsh & McLennan, Incorporated, a Chicago-based company, is perhaps the largest insurance brokerage and agency concern in the United States and is also active in many other parts of the world. In 1960, the Company and its subsidiaries had offices in 26 cities and 19 states in the United States. Worldwide, the Company had a total of 3,125 employees - about 1,085 of whom were actively engaged in soliciting, servicing, and dealing with clients, the rest being engaged in stenographic, clerical and supporting activities. About 90 percent of Marsh & McLennan's income comes from commissions paid by insurance companies for the placement of insurance for clients consisting largely of industrial, mercantile, utility, transportation, and financial organizations - including many of the largest corporations in the United States. No single customer accounts for more than 1 1/2 percent of the Company's total business. *18 While the Company places all kinds of insurance, it is mostly concerned with fire, marine, and casualty coverage and, to a lesser extent, with life insurance, pension annuities, and reinsurance. The other 10 percent of the Company's income comes from fees for special services performed for clients, such as pension planning, actuarial consulting in connection with pension plans, and loss adjusting. The Company's sales representatives typically study the client's needs for all types of insurance and develop programs, which sometimes involve a "tailor-made" policy to meet those needs on an economical basis. Such policies or programs are often submitted to several insurance companies for bids. Clients are solicited largely on the basis of personal and business friendships and, with few exceptions, all of the Company's officers have been engaged in such solicitation activity for most of their business careers. Clients are sometimes lost through mergers and acquisitions by dominant firms with competitive brokerage connections and, especially since 1962, through employees leaving the Company and taking clients with them. The Company faces competition from one large firm of insurance brokers *19 which also operates on a nationwide basis, from mutual insurance companies and certain stock companies that have their own salesmen and deal directly with clients, and, in many communities, from individual brokers and small insurance brokerage firms. Marsh & McLennan's management has been aggressive in promoting growth, both internally and by acquisition. During 1957 through 1961 it acquired 14 other insurance brokerage and agency concerns. The 1197 acquisitions had been carefully selected as a part of a program designed to strengthen the Company's situation by adding services in geographical areas or key cities where it had not been represented, to increase its services in areas where it already was represented, to add important major new accounts, and to strengthen management by securing able individuals. The usual price paid by the Company when it acquired an insurance agency or brokerage business included an amount for the net assets plus an amount for the going concern value. The going concern value usually was paid through a continuing division of commissions in years subsequent to the acquisition. The financial results of those acquisitions have been integrated with those *20 of the Company, so the effect thereof on its revenue and income for any particular year cannot be accurately determined. In 1960 and 1961 the favorable factors outnumbered the unfavorable factors as far as the future prospects for Marsh & McLennan were concerned. Its continued growth and prosperity depended on the continued need for its services, and with the increasing complexity of American business and the new types of hazards to which it is exposed, Marsh & McLennan's services were becoming more and more in demand. Marsh & McLennan was incorporated in 1923 to succeed the partnership of Marsh & McLennan, which resulted from the consolidation (in 1905) of several other insurance brokerage and agency firms, one of which was founded as early as 1871. From the time of the Company's incorporation in 1923 until the public offering of its stock on March 20, 1962, the Company's stock was owned only be selected directors, officers or employees of Marsh & McLennan or its subsidiaries. [7] All issued stock was held in the Voting Trust and was further subject to the Stockholders Agreement governing the terms and conditions of the sale, transfer and repurchase of stock and voting trust certificates. *21 The purposes of the Stockholders Agreement were to provide limitations on transfer so that the stock would remain closely held only by key personnel; to compel resale of stock to the Company at an established formula upon death of a stockholder or the termination of his employment by resignation or retirement; and to impose a covenant not to compete upon such key personnel upon their resignation or retirement so they would not leave and take business from or compete with the Company. The September 20, 1957 Stockholders Agreement, [8] in effect during the years at issue, was substantially similar to the agreements in effect since 1923. It provided that the Company could sell its stock only to directors, officers or employees of the Company or its subsidiaries (called "Proprietors"). A Proprietor and any subsequent owner ("Transferee") of his stock were required to resell the stock to the Company and the Company was required to purchase the stock at a price to be determined in accordance with the Stockholders Agreement (hereinafter called the "Formula Repurchase Price") *22 upon an "event of termination." [9] The Proprietor's death, attainment of age 70, or earlier termination of employment for any reason constituted an "event of termination." The Company reserved the right to repurchase its stock upon different terms, with consent of the stockholder. The Stockholders Agreement did not set the price to be used either in the sale of stock by the Company to employees or in the transfer of stock between Proprietors. With respect to sales by the Company to employees, it required that the board of directors determine the terms thereof. But sales or other dispositions of the Company's stock by a Proprietor or a Transferee prior to the Proprietor's event of termination were subject to the Company's right of first refusal at its choice of either the proposed sale price or the Formula Repurchase Price. Even if the Company chose not to exercise its right of first *23 refusal, the stock in the Transferee's hands was subject to a repurchase option exercisable either by the Proprietor (at the original sales price unless the Proprietor and Transferee agree to a different price) [10] or by the Company (at the "Formula Repurchase Price"). The Formula Repurchase Price was the "Formula Book Value" plus (at the Company's option) either (a) 50 percent of "Formula Net Income" per share for each of the 10 years following termination (called 1198 the "run-off") or (b) five times the average "Formula Net Income" per share in the five years preceding termination, payable in a lump sum within 180 days after the Company purchased the stock. Under either option, payment by the Company of the Formula Book Value was required to be made in 16 quarter-annual installments during a four year period beginning shortly after the Company purchased the stock, unless the Company desired to prepay any or all installments. Formula Book Value per share was the book *24 value as shown on the Company's books, with certain adjustments, divided by outstanding shares, i. e., excluding treasury shares. Formula Net Income per share was net income as shown on the Company's books, with certain adjustments, divided by issued shares, i. e., including treasury shares. [11] Except in the cases of certain settlements described below, the Company, in making repurchases, has always elected the "run-off" option rather than the lump-sum option. The Stockholders Agreement contained a covenant by each employee-stockholder not to engage in the insurance business in any way for ten years after termination of employment and the unpaid or unaccrued *25 "run-off" portion of the Formula Repurchase Price was subject to forfeiture if this covenant were breached. A summary of pertinent Marsh & McLennan financial data for the years 1949-1961, including data used by the Company for purposes of the Stockholders Agreement, is presented below. [12]
*26 1199
1949
1950
1951
1952
1953
1954
COMMON STOCK DATA:
1) Shares issued
270,000
270,000
270,000
270,000
540,000
540,0000
2) * Treasury shares
(a) * Subject to exercised options
(b) * Company owned i
16,116
16,116
16,116
16,116
32,232
32,232
(c) * Total
16,116
16,116
16,116
16,116
32,232
32,232
3) * Shares outstanding (1-2c)
253,884
253,884
253,884
253,884
507,768
507,768
BOOK VALUE DATA:
4) * Book value per books
5,213,000
5,780,000
$6,964,000 A
$7,855,00
$8,848,00
$9,396,00
5) * Book value per share
$ 20.53
$ 22.76
$ 27.43
$ 30.93
$ 17.43
$ 18.50
6) Formula book value
6,392,000
7,042,000
8,466,000
8,238,000
6,431,000
7,007,000
7) Formula book value per share (6/3)
$ 25.18
$ 27.74
$ 33.35
$ 32.45
$ 12.67
$ 13.80
INCOME DATA:
8) Gross income
$ 16,715,000
$ 17,998,000
$ 21,047,000 A
$ 23,598,000
$ 25,259,000
$ 26,236,000
9) * Net income
2,777,000
2,922,000
2,658,000 A
2,819,000
2,532,000
2,771,000
10) * Net income per share (8/3)
$ 10.94
$ 11.51
$ 10.46
$ 11.10
$ 4.99
$ 5.46
11) Formula net income
2,698,000
2,843,000
2,396,000
2,906,000
2,645,000
2,791,000
12) Formula net income per share (11/1)
$ 9.99
$ 10.53
$ 8.88
$ 10.76
$ 4.90
$ 5.17
DIVIDEND AND SURPLUS DATA:
13) * Dividends
$ 1,537,000
$ 1,523,000
$ 1,523,000
$ 1,523,000
$ 1,523,000
$ 1,269,000
14) * Dividend per share
$ 6.00
$ 6.00
$ 6.00
$ 6.00
$ 3.00
$ 2.10
15) Net income minus dividends
1,240,000
1,399,000
1,135,000
1,296,000
1,009,000
1,502,000 1200 1955
1956
1957
1958
1959
1960
1961
COMMON STOCK DATA:
1) Shares issued
540,000
540,000
540,000
540,000
540,000
540,000
540,000
2) * Treasury shares
(a) * Subject to exercised options
11,750
23,700
28,600
(b) * Company owned (i)
101,886
93,136
73,136
116,374
121,119
68,244
84,509
(c) * Total
101,886
93,136
73,136
116,374
132,869
91,944
113,109
3) * Shares outstanding (1-2c)
438,114
446,864
466,864
423,626
407,131
448,056
426,891
BOOK VALUE DATA:
4) * Book value per books
$ 9,780,000
$ 11,134,000
$ 10,897,000
$ 12,993,000
$ 12,718,000
$ 14,060,000
$ 12,779,000 Aii
5) * Book value per share (4/3)
$ 22.32
$ 24.91
$ 23.34
$ 30.67
$ 31.24
$ 31.38
$ 29.94
6) Formula book value
7,527,000
8,829,000
10,917,00
11,028,000
10,839,000
12,025,00
14,435,00
7) Formula book value per share (6/3)
$ 17.18
$ 19.76
$ 23.38 iii
$ 26.03
$ 26.62
$ 26.84
$ 33.81
INCOME DATA:
8) Gross income
$ 26,981,000
$ 31,075,000
$ 35,248,000
$ 36,932,000
$ 41,354,000 A
$ 43,508,000 A
$ 46,800,000 A
9) * Net income
2,456,000
3,346,000
3,234,000
2,882,000
3,964,000 A
$ 4,572,000 A
$ 4,802,000 A
10) * Net income per share (8/3)
$ 5.61
$ 7.49
$ 6.93
$ 6.80
$ 9.74
$ 10.20
$ 11.25
11) Formula net income
2,730,000
2,911,000
3,107,000
3,109,000
3,722,000
4,094,000
4,496,000
12) Formula net income per share (11/1)
DIVIDEND AND SURPLUS DATA:
13) * Dividends
$ 1,234,00
$ 1,071,00
$ 991,000
$ 912,000
$ 1,000,000
$ 916,000
$1,140,00
14) * Dividend per share
$ 2.40
$ 2.40
$ 2.40
$ 2.40
$ 2.40
$ 2.40
$ 2.40
15) Net income minus dividends
1,222,000
2,275,000
2,243,000
1,970,000
2,964,000
3,656,000
3,662,000
*27 *28 1201 The "per-share" data shown above have not been adjusted to reflect the following stock splits or stock dividends - a 2-for-1 *29 stock split on January 2, 1953; a 25% stock dividend on July 5, 1955; and a 20% stock dividend on December 30, 1960. Dividends per share during the years 1949-1961, adjusted backward for shares held on December 31, 1961, were as follows: Year
Dividends Per Share (Adjusted)
1949
$ 2.00
1950
2.00
1951
2.00
1952
2.00
1953
2.00
1954
1.40
1955
2.00
1956
2.00
1957
2.00
1958 2.00
1959
2.00
1960
2.00
1961
2.40 For the years 1949 and 1955 through 1961, the Company's capacity to pay dividends was substantially affected by the excess of the Company's payments for repurchased shares over the amounts received from the sale of its shares to its employees. Fromits incorporation in 1923 until 1944, the Company was virtually run by one man, Donald R. McLennan, who was the sole voting trustee of the Voting Trust which held all of the Company's stock. After McLennan's death in 1944 Charles W. Seabury took over as sole voting trustee and head of the Company, but he was more inclined to share the exercise of his power with other directors, particularly Lawrence Kennedy (the number 2 man in the Company). In 1955, Kennedy replaced Seabury as sole voting trustee and chief executive *30 officer, but Kennedy died within six months. Before his death, Kennedy had designated four men to succeed him as voting trustees: Hermon Dunlap Smith (a petitioner herein), John Holbrook, Preston Kelsey, and Walter Schwindt. Smith, who succeeded Kennedy as chief executive officer, relied more on the advice of other senior members of the firm than did his predecessors, but nevertheless reserved for himself the power to make final decisions on important matters. From 1923 until 1955, the Company's board of directors consisted of from 5 to 11 men, all of whom were officers and stockholders of the Company, except for a few instances when officers who were not stockholders served on the board. The executive committee of the board of directors usually consisted of three men, the sole voting trustee and two other stockholder-officers. Over the years there was a gradual broadening of the stockholder group - from 6 stockholders at the inception to 13 in 1935, to 15 in 1945 and to 26 at the end of 1955. After Smith took over in 1955, he arranged for sales of stock to the younger officers and employees who were considered to have more than average business potential in order to tie them to *31 the future of the Company. As a result the stockholder base was broadened until, at the end of 1961, there were 74 stockholders. Although in form a corporation, Marsh & McLennan was operated more like a tightly-controlled partnership. There never was a stockholders' meeting. The identity of those officers or employees who were stockholders and the number of shares owned were kept secret from other officers or employees, other stockholders and even from some of the directors. Stockholders were ever shown financial statements. Directors were never shown financial statements. Directors were shown financial statements at meetings but were not allowed to take them away. The younger officers and employees who were offered stock in the Company purchased it because they were satisfied that it was a sound and profitable investment, because they felt that they were being "admitted to the partnership," because they felt that the offer of the stock to them was a sign of recognition by top management, and because they thought that their purchase of it might facilitate their advancement in the managerial hierarchy of the organization. From 1942 until 1945 the Company sold stock to officers at *32 a price slightly below its Formula Book Value at the time of sale. During the late 1940's, when the Formula Book Value was increasing and the dividend yield was decreasing, it became more difficult to sell the stock. Consequently, from November 1945 until September 1949, all stock sold by the Company to its officers was priced at $10.40 per share, the Formula Book Value as of October 31, 1945. With regard to the 1948 and 1949 sales to officers and employees at $10.40, when the Formula Book Value was $22.57 and $25.18 the Commissioner determined that the officers and employees had received ordinary income to the extent of the difference between the sales price and an amount determined by him to be the fair market value 1202 of the stock. Petitions were filed with the Tax Court, but the cases were settled in 1953 prior to trial. Thereafter all sales of stock by the Company to its officers and employees were made at or near Formula Book value. During the mid-1950's the Formula Book Value again began to increase, thus requiring greater cash outlay by stockholders for a less attractive dividend yield. The Company experienced increasing difficulty in selling stock to officers and employees *33 who were pressed for cash and had to borrow to finance purchases at a time when the dividends (after taxes) were not sufficient to service the debt. As a result, during the period 1955-1960, sales of stock to officers and employees (not involving stock exchanges) amounted to only 15% of stock repurchased from stockholders. The Company did not want the stock to be sold only to those who had the cash to buy it; it also, and particularly, wanted the younger men, who were the future of the Company but whose cash position might not be good, to have a stake in the Company and to be tied to the Company by ownership of its stock and the covenant not to compete which was a prerequisite to the enjoyment of any "run-offs" upon the occurrence of any "event of termination." To solve this problem, the Company devised a stock option plan in 1949 to help its officers-employees finance the purchase of stock. Under the plan, the Company granted a so-called "Restricted Stock Option" at Formula Book Value near the time the option was granted to those officers employees it wanted to purchase stock. The option could be exercised by executing a binding contract to pay for the stock within five years, in *34 which case the Company retained the stock until it was paid for and no dividends were payable in the interim; however, the optionee was given an annual bonus equivalent to twice the amount of dividend he would have received if he had paid for his stock and taken delivery. Although the double-the-dividend bonuses were not sufficient (after income taxes) to cover the cost of the stock, they did help subsidize purchases and a number of options were granted and exercised during the years 1959, 1960 and 1961. From the time of the Company's incorporation in 1923 until March 20, 1962, when Marsh & McLennan went public, the only transactions for value involving the Company's common stock were as follows: (A) Sales by the Company to its officers or employees; (B) Repurchases by the Company from officers and employees or their estates; (C) Occasional sales between officers and employees; (D) The 1958 exchange by the Company of its stock in Transatlantic Reinsurance Company for some of its own stock (hereinafter referred to as the Transatlantic transaction); and (E) The 1958 exchange by the Company of its stock in Marsh & McLennan-Cosgrove & Company, Inc. (hereinafter referred to as the *35 Cosgrove transaction). As noted above, all sales by the Company to its officers or employees since 1942 were at or near Formula Book Value, except for a few years in the late 1940's, when the stock price was "frozen" at the October 31, 1945 Formula Book Value. On April 16, 1943, stockholder Marsh transferred to the Company as a gift and without consideration [13] the 20,000 shares of Marsh & McLennan stock which constituted all of his stockholdings in the Company as of that date.
The Company's other repurchases or reacquisitions of stock from officers or employees or their estates usually occurred on an "event of termination" and were usually at the Formula Repurchase Price, with the following exceptions: 1203 Formula Book Value Name of Seller
Date of Repurchase
Number of Shares Repurchased
Repurchase Price Per Share Paid
Date
Amount
Percent of Company's Outstanding Shares Owned By Seller Before Repurchase
McLennan, Sr.
6/16/26
15,000
$12.80
Not Shown
53.31%
McLennan, Sr.
2/25/29
[1] 21,720
[1] 10.00
Not Shown
51.49
McLennan, Sr.
* 12/29/44
[2] 160,000
[2] 15.00
11/30/44
$ 8.91
46.33
Seabury
7/28/49
30,000
40.00
12/31/48
22.57
30.52
McLennan, Jr.
2/27/58
18,884
[3] 36.00
12/31/57
23.38
7.26
*36 *37 Sales of the Company's stock between officers subsequent to 1945 were as follows: Formula Book Value Per Share Where used as a Basis for Sales Price
Nearest Calculations of Record Preceding Sale
Date
Number of Shares Sold
Price Per Share
Amount
Date Calculated
Amount
Date Calculated
1/24/46
2,500
$10.40
$10.40
10/31/45
$11.99
12/31/45
7/15/46
5,002
10.40
10.40
10/31/45
11.99
12/31/45
7/ 5/55
43,590
15.00
[1]
[1]
14.99
6/30/55
1/27/56
5,000
15.00
[1]
[1]
17.18
12/31/55
7/16/56
2,000
16.39
16.39
3/31/56
17.66
6/30/56
12/27/60
10,151
26.06
26.06
9/30/60
26.06
9/30/60
*38 In the 1946 transactions the vendor was Charles Seabury, sole voting trustee and most of those who purchased his stock had owned no stock in the Company previous to these purchases. In the 1956 transactions the vendor was D. R. McLennan, Jr. and all of those who purchased his stock had owned no stock in the Company previous to these purchases. In the 1955 transaction seven of the Company's officers sold stock to 11 other officers; in 1960 four officers sold stock to eight other officers. Both of these transactions were initiated by and made pursuant to the recommendation of the Company's chief executive officer (Lawrence Kennedy in 1955 and Hermon Smith in 1960) in order to realign stockholder interests in the Company upon the occasion of the declaration of a stock dividend which made the transactions feasible. No selling shareholder sold more shares than he had received as a stock dividend immediately prior to the transaction. In general the selling shareholders in these transactions were older than the purchasing shareholders. 1204 The management of the Company was interested in arranging for the 1955 and 1960 sales of the Company's stock by the selling shareholders to the *39 purchasing shareholders holders because they would tend to defer Repurchase Price payment and thus, to some extent, protect working capital, because they would strengthen the bonds between the Company and its younger and more active proprietors by increasing as to them the sanction of potential future "run-off" payments on covenants not to compete, and because such purchases would constitute proper rewards to such employees for their services. Upon the declaration of the 1960 stock dividend Hermon Smith felt that a number of stockholders no longer as active in the business as they formerly had been who needed cash for certain personal reasons might be glad to sell all or a part of their stock dividends at the Formula Book Value to other stockholders considered by Smith and his advisors to be valuable to the Company and entitled to be considered as recipients of an increase in their ownership of Marsh & McLennan stock. His inquiries disclosed four stockholders who wished to sell their stock dividends at this price to the stockholders suggested by Smith. Their willingness to sell was because they had need for cash, and because, as Smith pointed out to them, they retained the right *40 to the "run-off" payments upon their "event of termination" in the same absolute amount as the amount of "run-off" to which they had rights prior to the distribution of the stock dividend (even assuming the entire stock dividend was sold) although by selling all or a part of their stock dividends they would relinquish the right to receive additional "run-off" payments. [14] Their willingness to make the sales was also due to their sympathy with the corporate objectives motivating the Company's management to arrange for these sales, of which they were aware, and their belief that the accomplishment of these objectives would enhance the value of the stock retained by them. Smith entered into an agreement with the Continental Illinois National Bank, whereby the Bank would act as escrow agent for the sellers and purchasers in this transaction. *41 In 1957 Marsh & McLennan decided to dispose of all of its interests in Transatlantic Reinsurance Company, a wholly owned subsidiary engaged in the business of reinsuring risks of insurance companies. It was able to do this by selling all of Transatlantic's stock (20,000 shares) to certain Marsh & McLennan officers who were interested in acquiring the ownership of Transatlantic. For purposes of the disposition, the shares of Transatlantic were valued at book value ($115.06 on March 31, 1957 and $112.60 on June 30, 1958). The shares were sold in the following manner: (a) Due to an event of termination the Company had an obligation under the Stockholders Agreement to repurchase from Herbert F. Eggert, Sr., as of May 31, 1957, 58,555 shares of its stock which were held in the name of his controlled corporation, Sandacres Associates, Inc. The Company exchanged 10,100 shares of Transatlantic (valued as of March 31, 1957) for the 58,555 shares of its own stock held by or on behalf of Eggert (valued at $19.83 per share - Formula Book Value as of May 31, 1957). As additional consideration for the Transatlantic stock, Eggert, through Sandacres, was to receive the ten year "run-off" payments *42 on the Marsh & McLennan shares which Sandacres transferred to the Company. (b) The Company transferred 5,900 shares of Transatlantic stock to D. R. McLennan, Jr. in exchange for 18,884 shares of the Company's stock. No event of termination had taken place with respect to McLennan, Jr. For purposes of the exchange, the Transatlantic shares were valued at their book value on March 31, 1957 ($115.06) and the Company's shares were valued at $36.00 each, a valuation which included a Formula Book Value of $19.83 and a figure representing the discounted value of "run-off" attributable to this stock. [15]
*43 1205 (c) Between April and September 1958, certain Company officers, including Eggert and McLennan, purchased the remaining 4,000 shares of Transatlantic for cash at $115.06 or $112.60 per share (book value on March 31, 1957 and June 30, 1958). In 1956, the West Coast operations of Marsh & McLennan and of certain individuals called the Cosgrove Group were consolidated in Marsh & McLennan-Cosgrove & Company, Inc. (called the Cosgrove Company), the stock of which was owned 50% by Marsh & McLennan and 50% by the Cosgrove Group. During 1957 and 1958, Marsh & McLennan purchased, for cash, 14% of the Cosgrove Company's stock from certain members of the Cosgrove Group. At the end of December 1958, Marsh & McLennan completed the acquisition of the remaining 36% of the Cosgrove Company's stock held by the Cosgrove Group - partly for cash and partly for Marsh & McLennan stock. For purposes of this transaction the Marsh & McLennan stock used in the exchange was valued at $41.29 per share (compared with Formula Book Value of $26.69 on December 31, 1958) and the Cosgrove Company's stock was valued at $1,070.76 per share (also in excess of its book value). The value of the Cosgrove Company *44 stock received in exchange, which was determined by a formula in the 1956 consolidation agreement, included payment for the goodwill of the Cosgrove Group's operations. Therefore, Marsh & McLennan's chief financial officer was able to convince the Cosgrove Group that for them to receive Marsh & McLennan stock valued at its Formula Book Value would be equivalent to receiving payment for their goodwill twice - once in valuing the Cosgrove Company stock under the formula contained in the 1956 consolidation agreement and again when the members of the Cosgrove Group retired from Marsh & McLennan and received not only Formula Book Value of the Marsh & McLennan stock but, also, the "run-off" - and that to avoid this result a higher value should be placed on the Marsh & McLennan stock for the purposes of that transaction. After considerable negotiation, a value of $41.29 was assigned to the Marsh & McLennan shares. In the minds of the Marsh & McLennan negotiators, that price represented Formula Book Value plus 1/2 of estimated discounted ten year run-off payments. As of October 1961, Marsh & McLennan had been receiving and was continuing to receive inquiries from some "very good friends" *45 in the investment banking business in regard to the possibility of a public offering of its stock. One such inquiry was made in October 1960, when an old friend of Mr. Smith, Marsh & McLennan's chief executive officer, who was with Reynolds & Co., a New York investment banking firm, raised the question with Smith during lunch. At that time (October 1960) no serious consideration was given by Marsh & McLennan's top management to such a possibility and no consultation was held with the directors or stockholders. In early October 1961, the subject of going public was again raised when Smith was telephoned by Walter Wilson, an old friend and a partner in Morgan Stanley & Co., New York investment bankers. Smith was willing to talk about it, and Smith later met with Wilson in New York. At that meeting, Wilson suggested sending some of his staff to Chicago to obtain financial and other information about the Company and Smith, after consulting with the executive committee, gave his permission. Later Morgan Stanley & Co. made a presentation of the opportunities presented by a public offering to members of the executive committee. There were differences of opinion among the executive committee *46 members as to the advisability of going public. Some members felt that for an organization that had always operated in secret as a family or a close partnership, going public was like "undressing in Macy's window." As of November 13, 1961, Smith did not wish discussion of the proposed public offering to extend beyond the executive committee, the comptroller and the secretary of the Company. On that date, 1206 Smith authorized Arthur Anderson & Co. to commence an audit of the Company's books in connection with the proposed offering which could be called off if the executive committee disapproved of his action. On December 13, 1961, the possibility of going public was discussed at a special meeting of the board of directors. At that meeting, the board authorized the executive committee to negotiate with Morgan Stanley in connection with the proposed public offering and to prepare a registration statement for filing with the Securities and Exchange Commission. On January 12, 1962, the stockholders were notified by letter from Mr. Smith of the proposed public offering and were asked to sign documents terminating the Stockholders Agreement and the Voting Trust. All of the stockholders *47 executed the documents, as requested, and the Stockholders Agreement and the Voting Trust were terminated in accordance with the terms of the documents. Thereafter the Company had no obligation to repurchase its shares. The Company's remaining runoff obligation was funded by the establishment of a reserve charged to retained earnings. At a special meeting of the board of directors on February 6, 1962, resolutions were approved to permit the public offering and to amend the articles of incorporation to permit an increase in authorized stock and a 5-for-1 stock split. Also at that meeting, the board of directors declared its intention to declare a 30-cent dividend for the quarter ending June 30, 1962, on each share of common stock outstanding after the 5-for-1 split. In order to recommend an appropriate offering price for the Company's shares, Morgan Stanley had requested the views of other underwriters in the syndicate formed by Morgan Stanley, and also of a number of brokers and institutional investors. Their suggested prices ranged from $40 to $50 after the 5-for-1 split. The timing of the proposed offering was fortunate; in the early part of 1962 there was a great demand for shares *48 of companies with established businesses which were going public for the first time and insurance stocks were quite popular. Morgan Stanley and the Company attempted to choose a price not so low that the stock would be underpriced and not so high that initial investors would be disappointed in the market price following the offering. It was determined that 673,215 shares of the Company's stock would be sold, 225,000 shares by the Company and 448,215 shares by its stockholders. On March 20, 1962, the Company's S.E.C. registration statement became effective and the stock was offered to the public at a price of $44.50 per share (after the 5-for-1 split). The following stock acquisitions are involved in the issues presented in the instant consolidated cases: On March 9, 1960, the Company granted options on its stock to the petitioners listed below who exercised their options on the dates, for the number of shares, and at the option price indicated: Petitioner
Docket No.
Date of Exercise
Number of Shares
Per Share Options Price
Garnett
6648-66 & 2544-67
3/21/60
2,000
$ 26.62
Houck
6649-66
3/21/60
500
26.62
Morey
6652-66
3/21/60
2,000
26.62
Nelson
3218-67
3/21/60
500
26.62
Sinnott
6655-66
3/21/60
500
26.62
*49 The Formula Book Value of the Company's shares as of Decemb The Formula Book Value of the Company's shares as of December 31, 1959 was $26.62 per share. On March 15, 1960, the Company granted an option on 1,000 shares of its stock at a price of $26.62 per share to petitioner Watkins, docket No. 6712-66, exercisable within one year and 30 days from the date of grant. Watkins exercised his option on March 23, 1961. On June 15, 1960, the Company granted options on its stock to the petitioners listed below who exercised their options on the dates, for the number of shares, and at the option price indicated: Petitioner
Docket No.
Date of Exercise
Number of Shares
Per Share Option Price
James
6650-66
6/24/60
500
$ 29.37
Souder
6658-66
6/24/60
500
$29.37 1207 The Formula Book Value of the Company's shares as of March 30, 1960 was $28.04 per share, and as of June 30, 1960 was $29.37 per share. On December 8, 1960, the board of directors of the Company declared the previously mentioned 20 percent stock dividend payable on December 20, 1960, to holders of record as of December 19, 1960. In lieu of issuing fractional shares cash was to be distributed based upon *50 a whole share value of $31.27, an amount equal to the Formula Book Value per share as of September 30, 1960. On December 27, 1960, the petitioners listed below purchased stock from other officers in the previously mentioned 1960 sale between officers: Petitioner
Docket No.
Number of Shares
Price
Morey
6652-66
1,000
$ 26.06
Orloff
6653-66
500
26.06
Smith
6657-66
2,051
26.06 The sales price was equal to Formula Book Value of the Company's shares as of September 30, 1960, adjusted to take into account the 20 percent stock dividend. On January 3, 1961, the Company granted options on its stock to the petitioners listed below who exercised their options on the dates, for the number of shares, and at the option price indicated: Petitioner
Docket No.
Date of Exercise
Number of Shares
Per Share Option Price
Anderson
6647-66
1/20/61
500
$ 26.84
Hoagland
3215-67
1/20/61
400
26.84
Leftwich
3216-67
1/20/61
400
26.84
Moore
6651-66
1/20/61
500
26.84
Regan
6654-66
1/20/61
500
26.84
Sinnott
6655-66
1/20/61
400
26.84
Sked
6656-66
1/20/61
500
26.84 The Formula Book Value of the Company's shares as of December 31, 1960 was $26.84 *51 per share. On January 9, 1961, the Company sold 500 shares of its stock to petitioner Souder, docket No. 6658-66, at a price of $26.06 per share. None of the petitioners sold any of the stock acquired in the transactions described above prior to March 20, 1962, the date of the public offering. [16]
In the statutory notices of deficiency involved in these proceedings, respondent determined that all of the petitioners herein had realized ordinary income in 1962, measured by the difference between the purchase price and the fair market value of the stock at the time of purchase or grant of the stock options (1960 or 1961) without taking into account the existence of the Voting Trust *52 and the Stockholders Agreement to which the stock was in fact subject at the time. Respondent determined these per share fair market values to be $201.80 and $242.16 for 1960, and $211.90 and $254.28 for 1961. In the cases of 13 of the 16 petitioners herein, respondent determined in the alternative that ordinary income had been realized in 1960 or 1961, when stock was purchased or stock options were exercised, measured by the difference between the purchase price and the fair market value of the stock at the time of purchase or exercise taking into account the provisions of the Voting Trust and the Stockholders Agreement. Respondent determined these per-share fair market values to be $65 for 1960 and $70 for 1961. [17] In the statutory notices all 1208 acquisitions were treated alike and were characterized as stock option acquisitions. *53 The fair market value of the stock of the Company on March 9, March 15 and March 21, 1960, was $45 per share. The fair market value of the stock of the Company on June 15 and June 24, 1960, was $47 per share. The fair market value of the stock of the Company on December 27, 1960, was $44 per share. The fair market value of the stock of the Company on January 3, January 20 and March 23, 1961, was $46 per share. Opinion KERN, Judge: At issue in these consolidated cases are the tax consequences of the acquisition by petitioners, during 1960 and 1961, of stock of their employer, Marsh & McLennan, Inc., the largest firm of insurance brokers in the country. In most of these cases the stock was acquired through the exercise of stock options granted by the Company shortly before they were exercised. Also involved are one purchase directly from the Company not through the exercise of an option and three purchases directly from other stockholders. All of the Company's stock was closely held by selected officers and employees under the provisions of a Voting Trust and Stockholders Agreement in effect since the Company's incorporation in 1923, which governed the terms and conditions of *54 sales, transfers and repurchases of the stock by the Company. These agreements were terminated on March 20, 1962, by the requisite unanimous action of the Company's stockholders in order to permit a public offering of the Company's stock. Relying mainly on Treasury Reg. section 1.421-6(d)(2), set forth later in this opinion, respondent's primary contention is that these stock acquisitions were compensatory bargain purchases, taxable as ordinary income when the Voting Trust and the Stockholders Agreement were terminated in 1962, to the extent of the difference between cost and the fair market value of the stock when acquired in 1960 and 1961, determined as if the Voting Trust and the Stockholders Agreement did not then exist. Petitioners' primary contention is that no taxable event occurred in any of the years before this Court because the options involved were "restricted stock options" under sections 421 and 424 of the Code. The contend that in each case the option price, determined by reference to a "Formula Book Value" as defined by the Stockholders Agreement and calculated by the Company as of the approximate date of the options, was at least 85 percent of the fair market value *55 of the Company, stock when the options were granted. In the event that neither primary positions of the parties are sustained, both contend that compensation was realized when the stock was acquired 1209 by purchase or by exercise of options in 1960 and 1961, to the extent of the difference between the cost and the fair market value at that time, determined by taking into account the Voting Trust and the Stockholders Agreement then in effect, [18] except that petitioners contend that the three stock purchases directly from other stockholders were not compensatory and therefore not income to the purchasers. However, the petitioners also contend that any income to them resulting from a difference between the cost and the fair market value of the stock purchased in 1960 or 1961 pursuant to options was less than 25 percent of their reported income for those years and consequently the statutory period of limitation prevents the collection of any tax thereon. *56 The principal questions of law relate to the applicability of Reg. section 1.421-6(d)(2) to the facts of these cases and, if it is applicable, the validity of that regulation. The questions of fact mainly relate to the fair market value of Marsh & McLennan stock in 1960 and 1961, determined either in the light of the restrictions imposed by the Voting Trust and the Stockholders Agreement (for the purpose of measuring compliance with the 85 percent statutory "restricted stock option" test when the options were granted, or of determining the amount of compensation on the purchase of the stock or the exercise of stock options under the alternative theory of both parties) or without reference to such restrictions (for the purpose of measuring the amount of compensation under the respondent's primary theory). Petitioners have introduced the testimony and the reports of two expert witnesses, directed to the valuation of the Marsh & McLennan stock for the purposes previously stated and the testimony and reports of two other expert witnesses have been adduced by the respondent. The diversity of the conclusions reached by these expert witnesses relied upon by the parties can be observed *57 by an examination of the tabulations set forth below. One of the questions most strenuously argued by the parties in the instant consolidated cases was the question of whether or not the burden of proof with respect to the 1962 deficiencies should remain upon the petitioners in accordance with the general rule of Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8, since respondent's statutory notices of deficiencies for that year were sent to each petitioner within the statutory three-year period from the time their 1962 returns were due to be filed plus the extension of that period agreed to by the parties. Petitioners filed a motion for a pre-trial determination by the Court that respondent should have the burden of proof at trial as to the 1962 deficiencies, on the ground that respondent's determination of value without restrictions, for the purpose of determining the 1962 deficiencies, was so excessive, erroneous, arbitrary and capricious as to deprive the statutory notice of its usual presumptive correctness and shift the burden of proof, at trial, to respondent. Prior to the commencement of the trial proper, the Court held a preliminary hearing and took evidence *58 on petitioners' motion. The Court ruled that while the use of the 1962 public offering price after the provisions of the Stockholders Agreement were abrogated, discounted back to the dates of sale at a rate of 5 percent per year, but taking no other factors into account, was erroneous as a valuation method, nevertheless it was not so arbitrary and capricious as to require respondent to undertake the burden of going forward with the presentation of evidence at the trial with respect to the taxable year 1962. Consequently, petitioners' motion was denied, although the Court's ruling did not preclude consideration of the burden of proof issue after the facts had been fully developed at trial. Since respondent concedes that as to the 1960 and 1961 deficiencies he has the burden of proof on account of the three-year period, it is only with regard to the 1962 deficiencies that the burden of proof question is important. Therefore the issue presented by the petitioner's pre-trial motion, and later by petitioners in their briefs, need not be decided if we were to decide that the stock acquisitions here at issue are not subject to tax in 1962, the year in which the Voting Trust and Stockholders *59 Agreement were terminated in order to permit a public offering of some of the Company's stock. The determinations by respondent of deficiencies in 1962 with respect to all of the 1210 TABULATION OF EXPERTS' VALUATIONS
(With Restrictions)
Petitioners' Experts
Respondent's Experts
Williams [4]
Value at Public Offering
Valuation Month [1]
Formula Book Value
Glore Forgan
Morgan Stanley
Statutory Notice Value [2]
Kelting [3]
Long
10-year Run-off
5-Year Retrospective
Formula Book Value x(100/95)
1960:
$ 267.00
March
$ 26.62
$ 26.62
$ 28.54
$ 65
$ 57.32
$ 69.82
$ 72.67
$ 59.94
$ 31.32
$ 267.00
June
29.37
29.37
27.36
65
57.32
69.82
72.67
59.94
34.55
$ 222.50
December
26.06
26.06
30.15
65
57.32
(See Note 5[5])
30.66
1961:
$ 222.50
Jan.
26.84
26.84
27.39
70
57.59
71.36
74.95
62.12
31.58
*60 1211 TABULATION OF EXPERTS' VALUATIONS
(Without Restrictions)
Petitioners' Experts
Respondent's Experts
Williams Public Offering Value
Valuation Month [1]
Formula Book Value
Glore Forgan
Morgan Stanley
Statutory Notice Value [2]
Long [3]
Rule-of-Thumb Method
Price-Earnings Method
Correlation Analysis
1960:
$ 267.00
March
$ 26.62
$32.06
$ 27.55
$ 242.16
$82.08
$ 149.78
$ 152.44
$ 145.77
$ 267.00
June
29.37
31.54
27.38
242.16
75.20
149.42
152.80
146.00
$ 222.50
December
26.06
30.86
27.55
201.80
(See Note 4[4])
1961:
$ 222.50
January
26.84
33.85
27.38
211.90
114.68
144.46
149.75
164.01
*61 1212 petitioners rests upon the applicability and validity of the rules stated in T.D. 6416, 1959-2 C.B. 126 (September 24, 1959), which includes both Treasury Reg. section 1.421-6 (d)(2), alleged by respondent to apply to those petitioners who acquired their stock by option, and Treasury Reg. section 1.61-2 (d)(5), alleged by respondent to apply to those petitioners who acquired their stock by purchase. Petitioners urge strongly and persuasively that both regulations are invalid. Petitioners also argue strongly and convincingly that the purpose and theory of both regulations, reflected in the language of present Reg. section 1.421-6(d)(2), clearly demonstrate that the regulation was not intended to apply to facts such as those present in these proceedings. We decide, in accordance with petitioners' latter contention and for reasons which will be discussed later in this opinion, that these regulations were not intended to apply and do not apply to facts such as those here present; consequently we need not rule on the validity of these regulations and refrain from doing so in spite of the persuasive arguments of the petitioners. *62 Since we are also of the opinion that the deficiencies determined by respondent for the year 1962 cannot be sustained on any other theory, and since respondent concedes that he has the burden of showing the omission of over 25 percent of taxable income shown in the petitioners' tax returns resort to burden of proof principles is necessary to resolve factual matters here in controversy the burden of proof rests upon respondent. We now turn to petitioners' primary position that the stock options granted to a large number of the petitioners in these proceedings were statutory "restricted stock options" within the purview of present sections 421 and 424 of the Code. [19] As to whether these stock options qualify for treatment as "restricted" stock options the parties appear to agree that there is only one question before us: whether or not the option prices were at least 85 percent of the fair market value of the stock at the time the options were granted. *63 Hence we must determine what has been described in Morris M. Messing, 48 T.C. 502, 508 (1967), as "an oft-litigated and plaguing elusive question of fact," the value on given dates, the dates of grant of the stock options at issue herein, of the Marsh & McLennan stock subject to the Voting Trust and the Stockholders Agreement, minority interests in stock which had no voting power because the former document and which had a very narrow actual "market" as a result of the latter one. As in the Messing case the gap separating the parties and their expert witnesses on these valuation questions as shown in the tabulations above is substantial. The reason for the gap becomes apparent on an examination of the differing assumptions, theories and calculations employed by the expert witnesses in their analyses of the value of this stock, some of which are spun out to the very limit of statistical sophistication. Although Marsh & McLennan was a closely held corporation and transactions in its shares were subject to the terms of the Stockholders Agreement, nevertheless a considerable number of transactions in its shares did take place. The preponderance of *64 these transactions were, of course, sales 1213 of stock by the Company to its employees generally at or near a recent Formula Book Value price, and resales by employees to the Company generally at the Formula Repurchase Price following an "event of termination." There were in addition several transactions whose terms, unlike the transactions mentioned above, were not dictated by the Stockholders Agreement (resales to the Company) or by long-standing Company policy (sales by the Company to its employees at a price at or near Formula Book Value). On occasion there were sales of the stock between Company employees. Also a value had to be placed on the stock in connection with the bargaining of the parties incident to the Transatlantic and the Cosgrove transactions, both of which are set out in detail in our Findings of Fact. Thus the record shows that persons other than the expert witnesses who have testified in these proceedings have also had to assess the value of Marsh & McLennan stock, as subject to the Voting Trust and the Stockholders Agreement, on occasions when these persons have chosen to enter into actual transactions with respect to that stock. A consideration of the underlying *65 circumstances surrounding these transactions and the ultimate values placed on the Marsh & McLennan stock by the parties thereto, is obviously relevant, and in our opinion very persuasive, in attempting to evaluate this stock on the several valuation dates before us. Among the larger transactions which were outside the scope of the ordinary guidelines of the Stockholders Agreement and long-standing Company policy were the resale by the estate of Donald R. McLennan, Sr. of 160,000 shares to the Company at a negotiated price of $15 per share rather than the Formula Repurchase Price at a time when the Formula Book Value of the Company was calculated to be $8.91 per share, [20] the Cosgrove transaction, the Transatlantic transaction, the resale prior to an "event of termination" by Charles W. Seabury of 30,000 shares to the Company in 1949 at $40 per share at a time when the most recent prior Formula Book Value was calculated by the Company to be $22.57 per share, and the sales between officers following the declaration of stock dividends in 1955 and 1960. [21]
*66 In neither the Transatlantic transaction nor the Cosgrove transaction was the value attributed to the Marsh & McLennan shares considered to be equivalent to the Formula Book Value as calculated by the Company at or near the time of these transactions. [22] In the Transatlantic transaction, McLennan, Jr. received Transatlantic shares, valued at their March 31, 1957 book value, in exchange for Marsh & McLennan shares valued at $36 each, at a time when the last previous Formula Book Value amount calculated by the Company was $19.83 per share. [23] In the Cosgrove 1214 transaction, for purposes of the exchange to accomplish the acquisition of the Cosgrove group's interest in Marsh & McLennan-Cosgrove & Company, Inc., the stock in that company was valued at a price approximating its value as a going concern and the Marsh & McLennan stock was valued at $41.29 per share. As of December 31, 1958, near the time this exchange took place, the Formula Book Value of Marsh & McLennan's stock was calculated to be $26.69 per share. [24] Each of these transactions appears to be the product of arm's-length bargaining between the Company and persons having an intimate knowledge of the Company's business, *67 its financial position and its future prospects. *68 In contrast to the evident arm's-length bargaining in the two transactions previously discussed, in the 1955 and 1960 sales between officers, following the declaration of stock dividends in those years, there were a number of different considerations and motivations at work. In these transactions, the Company stock was valued at a Formula Book Value price near the time of these transactions. Petitioner Smith testified that these transactions in both years were initiated and made pursuant to the recommendation of the Company's chief executive officer at the time in order to realign stock interests in the Company. And because of the declarations of stock dividends and certain provisions in the Stockholders Agreement, it was possible for the selling stockholders to enter into these transactions without losing certain rights they had accumulated as a result of prior purchases of the Company's shares. No selling shareholder in either of these transactions sold more than the number of shares he had immediately received as a result of the declaration of these stock dividends. Because of this fact, each of the selling stockholders retained a right to the "run-off" payments upon his "event *69 of termination" in the same absolute amount as he would have had if the sale and the preceding stock dividend had never taken place. This is because the "run-off" payments are based upon issued shares, rather than authorized shares or shares outstanding. This can be illustrated by the following hypothetical example: Suppose Marsh & McLennan had 500,000 issued shares [25] and A owns 50,000 of them. Suppose also, less than 400,000 shares are outstanding (over 100,000 shares being in the Company treasury). [26] The Company declares a 25 percent stock dividend, and A receives 12,500 shares of Company stock. Shortly afterwards, A sells the 12,500 shares he received as a dividend to other employees of the Company. A would still retain the same interest in the "run-off" portion of the Formula Repurchase Price upon an "event of termination" as he had prior to the stock dividend and the sale. This is because A would still retain 50,000 of the 500,000 issued shares, and the "run-off" portion of the Formula Repurchase Price depends upon the number of shares resold to the Company on an "event of termination" compared to the number of issued shares at that time. When the Company *70 declared stock dividends such as those declared in 1955 and 1960, the number of issued shares of the Company would not change, although the number of shares outstanding would change. Again using our hypothetical example, in selling his 12,500 share stock dividend, A would also sell 20 percent of his accumulated interest in the Formula Book Value portion of his eventual Formula Repurchase Price, because Formula Book Value was calculated in the Stockholders Agreement on the basis of shares outstanding and the amount of those shares had increased 25 percent. In selling the stock received as a stock dividend, A would also relinquish his right (after the stock dividend) to a 25 percent increase in the "run-off" portion of the Formula Repurchase Price to which he would otherwise be entitled and any dividends on the stock which he sold. In return A would receive cash in hand in the amount of a recent Formula Book Value placed on *71 the Company's shares. At the time the 1960 stock dividend was declared, the Companyalso raised the dividend rate so that the 1215 dividend paid as to each share after that 20 percent stock dividend would equal the dividend paid as to each share prior to the stock dividend. Petitioner Smith, as chief executive officer in 1960, inquired among a number of stockholders no longer as active in the business as they formerly had been who he thought might need cash for personal reasons in order to find potential sellers in the 1960 transaction willing to sell at prices equivalent to the Fomula Book Value, and chose younger and more active officers and employees whose services had been and would be valuable to the Company (and, presumably, with access to enough cash) to be considered as potential purchasers at an advantageous price who would thereby be able to increase in their ownership of Marsh & McLennan stock and thus strengthen the ties binding their futures to the Company and would feel more adequately compensated for their services. Smith testified that the selling shareholders felt that it would be good for the Company, and for the protection of their own dividends and "run-off" *72 payments in the future, if the suggested purchasing stockholders would continue to have a greater interest in the Company and its future. Obviously also, the selling stockholders and the Company must have been aware that the greater the proportion of outstanding stock held by younger shareholders who could anticipate "events of termination" occurring farther into the future, the less would be the immediate drain on the Company's earnings by Formula Repurchase Price payments to other stockholders, and thus the amounts of dividends on their retained stock and of "run-off" payments available to them in the future after their own "event of termination" would be protected. The persons controlling the policy of the Company were also interested in strengthening the bonds of the Company over its younger proprietors by increasing the sanction of potential future "run-off" payments on covenants not to compete, and in rewarding its younger and more active proprietors for their services. In our judgment, the several underlying considerations present in the 1955 and 1960 transactions between stockholders, which we have just discussed, indicate that the values of the Marsh & McLennan stock used *73 in these transactions do not correspond to the actual fair market value of that stock at the time of these transactions. The 1960 transaction between shareholders will again be discussed later in this opinion in connection with the issue of whether this transaction amounted to a compensatory "bargain sale" to the purchasers by the Company. The petitioners have argued that the fair market value of the stock acquired by purchase and by option should be found to be no greater than the Formula Book Value price paid or to be paid in the acquisition of these shares because the petitioners who were officers of the Company and who knew the Company and its stock best considered Formula Book Value to be a fair value and were willing to deal in the stock on that basis. Petitioners urge that this fact must be recognized as being important in determining what the fair market value of the Company's stock actually was. We have explained the unusual circumstances behind those transactions which have taken place at or near a Formula Book Value figure recent to those transactions. While we have considered these transactions in connection with the problem of valuation we reject petitioners' argument *74 that they constitute a factor to be given any considerable weight. We think it would serve no useful purpose to undertake a detailed analysis of the theories, assumptions and statistical calculations of the expert witnesses who appeared in these cases. Nor would it be of value to set out the many acute observations made by these witnesses, especially petitioners' two expert witnesses, which have assisted us in making the difficult determinations of value which we have been called upon to make in these cases. We have carefully reviewed the entire record in these cases in an effort to consider all of the elements of value of these shares and in an attempt to assess the reliability of all of the possible touchstones to be used in ascertaining these values. As did the expert witnesses, in making all of the valuations in these consolidated cases we have considered such matters as the business of the Company and its competitive position for the period during which the Company has operated, the Company's earnings capacity and earnings trend, the Company's management, the probability of the Company's growth either internally or through acquisition, the Company's dividend paying capacity and *75 policy - including stock dividends, the Company's financial condition and balance sheet, the Company's goodwill, the Company's method of obtaining working capital, the marketability of the Company's shares, the Formula Book Value of the Company and its future trend, the "runoff" portion of the Formula Repurchase Price and its future trend, the matters 1216 concerning the "events of termination" of the petitioners herein and of other shareholders and prior shareholders of the Company, and the effect of the last three matters mentioned above on the Company's working capital. In fixing the values of these shares on the dates relevant herein, we have placed heavy reliance on the actions of the participants in the Transatlantic transaction and the Cosgrove transaction, because we feel assured that those persons, exercising their powers as prudent businessmen and unencumbered by motivations and considerations which might prevent arm's length bargaining, took into account those factors among those enumerated above which as a practical matter would be most relevant to a determination of fair market value. Contrary to arguments made by the respondent we have accorded little weight either *76 to the fact of the public offering of the Company's shares or the price at which these shares were then made available to the public as factors bearing on the fair market value of the Company's stock in 1960 and 1961 (prior to October). There is no evidence in the record of these cases that any officer or director of the Company had an intention to create a public market for Marsh & McLennan stock when the options at issue herein were granted (or were exercised). The only evidence on the subject is that the first serious consideration of the possibility of making a public offering took place in October 1961, when a partner in Morgan Stanley & Co. approached Mr. Smith. The subject was kept highly confidential, and it was not even discussed by the board of directors until a special meeting called on December 13, 1961, wherein the board authorized its executive committee to negotiate with Morgan Stanley in connection with the public offering and to prepare a registration statement. The only other discussion of record concerning the possibility of Marsh & McLennan going public took place about a year earlier (October 1960) when an investment banker friend of Smith's raised the question *77 at lunch. If Marsh & McLennan had been seriously interested in going public, it would hardly have ignored the October 1960 suggestion and done nothing about the matter for a whole year. Even in late 1961 there was a sharp difference of opinion among board members as to the advisability of going public, several of them feeling rather strongly that if the Company "went public" there would inevitably be undesirable changes in the operation of its internal affairs. An argument similar to the contentions of respondent outlined above was considered and rejected in Morris M. Messing, supra, on facts even more favorable to the Commissioner than those herein. [27] We consider that the reasoning in the opinion in that case is applicable to the facts herein, and we rely on it. Based upon a consideration of all of the relevant factors mentioned above and urged upon us by the parties, we have held that the fair market values of Marsh & McLennan *78 stock on the pertinent dates were in the amounts stated in our findings of fact. Since it is evident that none of the petitioners herein who received stock options were to pay an amount in excess of 85 percent of the fair market value of the stock under option at the time these options were granted, none of these options were "restricted stock options" within the meaning of sections 421 and 424 of the Code. Therefore we must decide the issue of the validity or applicability of Treasury Regs. 1.421-6 (d)(2) and 1.61-2(d)(5) to the facts of these cases. Regulations section 1.421-6(d)(2) as it currently appears, reads as follows: [28]
Sec. 1.421-6(d)(2)(i). If the options is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of - (a) The difference between the amount paid for the property and the fair market 1217 *79 value of the property (determined without regard to the restriction) at the time of its acquisition, or (b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable. If the property is sold or exchanged in a transaction which is not at arm's length before the time the employee realizes compensation in accordance with this subdivision, any amount of gain which the employee realizes as a result of such a sale or exchange is includible in gross income at the time of such sale or exchange, but the amount includible in gross income under this subdivision at the time of the expiration of the restriction or the sale or exchange at arm's length shall be reduced by the amount of gain includible in gross income as a result of the sale or exchange not at arm's length. *80 (ii) The provisions of subdivision (i) of this subparagraph may be illustrated by the following examples: Example (1). On November 1, 1959, X Corporation grants to E, an employee, an option to purchase 100 shares of X Corporation stock at $10 per share. Under the terms of the option, E will be subject to a binding commitment to resell the stock to X Corporation at the price he paid for it in the event that his employment terminates within 2 years after he acquires the stock, for any reason except his death. Evidence of this commitment will be stamped on the face of E's stock certificate. E exercises the option and acquires the stock at a time when the stock, determined without regard to the restriction, has a fair market value of $18 per share. Two years after he acquires the stock, at which time the stock has a fair market value of $30 per share, E is still employed by X Corporation. E realizes compensation upon the expiration of the 2-year restriction and the amount of the compensation is $800. The $800 represents the difference between the amount paid for the stock ($1,000) and the fair market value of the stock (determined without regard to the restriction) at the time of its *81 acquisition ($1,800), since such value is less than the fair market value of the stock at the time the restriction lapsed ($3,000). Example (2). Assume, in example (1), that E dies one year after he acquires the stock, at which time the stock has a fair market value of $25 per share. Since the restriction lapses upon E's death, he realizes compensation of $800 ($1,800 less $1,000) and this amount is includible in E's gross income for the taxable year closing with his death. Example (3). Assume that, pursuant to the exercise of an option not having a readily ascertainable fair market value to which this section applies, an employee acquires stock subject to the sole condition that, if he desires to dispose of such stock during the period of his employment, he is obligated to offer to sell the stock to his employer at its fair market value at the time of such sale. Since this condition is not a restriction which has a significant effect on value, the employee realizes compensation upon acquisition of the stock. Example (4). Assume, in example (3), that the employee is obligated to offer to sell the stock to his employer at its book value rather than at its fair market value. Since *82 this condition amounts to a restriction which has a significant effect on value, the employee does not realize compensation upon acquisition of the stock, but he does realize such compensation upon the lapse of the restriction, such as, for example, his death or the termination of his employment. Regulations section 1.61-2(d)(5), as promulgated in T.D. 6416, supra, reads as follows: Sec. 1.61-2 Compensation For Services, Including Fees, Commissions, and Similar Items * * * (d) Compensation paid other than in cash. * * * (5) Property transferred subject to restrictions. - Notwithstanding any other provision of this paragraph, in the case of a transfer by an employer to an employee of any property subject to a restriction which has a significant effect on its value, the rules of sec. 1.421-6 shall be applied in determining the time and the amount of compensation to be included in the gross income of the employee. This subparagraph is applicable only to transfers after September 24, 1959. Neither party urges that the options received by those petitioners who received options had a readily ascertainable fair market value at the date *83 of grant and constituted taxable income at that time. See Commissioner v. LoBue, 351 U.S. 243, 100 L. Ed. 1142, 76 S. Ct. 800 (1956); M. P. Frank, 54 T.C. 75 (1970) on appeal (C.A. 7); Treasury Reg. 1.421-6(c). Also neither party urges that a hypothetical fair market value in 1960 or 1961 of Marsh & McLennan stock assumed to be not subject to the Voting Trust and the Stockholders Agreement would exceed the fair market value of the Marsh & McLennan stock on March 20, 1962, the date of the public offering. We note further that Reg. section 1.61-21218 (d)(5), relating to stock purchases, and Reg. section 1.421-6(d)(2), relating to stock options apply the same rules to the stock purchases and stock options here in controversy. It is respondent's position that when the petitioners exercised options to purchase or actually purchased the stock of Marsh & McLennan, that stock was "subject to a restriction which had a significant effect on its value" within the meaning of that language in Reg. section 1.421-6(d)(2) in that the stock was subject to both the terms of the Voting Trust and the terms of the Stockholders Agreement and, therefore, under the rules *84 of the regulations the potential taxable event is postponed beyond the time of the exercise of the options or the purchase of the stock. It is also respondent's position that a taxable event occurred when the Voting Trust and the Stockholders Agreement were terminated in 1962 in anticipation of the public offering since, respondent contends, this is the time when the "restriction [lapsed]" within the meaning of the regulation. [29] At that time, respondent continues, in accordance with the rule set forth in the regulation, each petitioner realizes taxable compensation measured by the difference between the cost of the stock acquired and the fair market value of that stock at the time the stock was acquired "determined without regard to the restriction." In the context of these cases respondent interprets these latter words of the regulation to mean "determined without regard to the existence of the Voting Trust and Stockholders Agreement." *85 Petitioners contend that even if the regulation is assumed to be valid it was never intended to be, and should not be, applied where all of stock of a closely held corporation is and has been since the organization of the corporation and the original issuance of its stock subject to the restriction of a buy-back agreement binding all of the stockholders which will not expire by reason of lapse of time or the occurrence of an event reasonably to be anticipated but to the contrary is obviously intended to continue in existence during the existence of the stock thus "restricted." In support of their contention, petitioners urge that an apparent underlying assumption behind the regulation is that there is or has been unrestricted stock susceptible of valuation which by comparison to the same type of stock subjected to a restriction could serve as a measure of any bargain element inherent in the sale of such stock and caused by temporary restrictions to be taxed under the regulation when the restrictions expire. Petitioners argue that the reference in the regulation to a "restriction" was intended to be a "restriction" upon the particular stock subject to the option which by its own terms *86 will lapse at some point in time, not permanent restrictions which have been in existence from the time of the issuance of the stock in question, which have been applicable and are intended to be applicable to all shares of stock at all times and without exception, and which are intended to apply to all of such stock during the indefinite future. We agree with petitioners' contention that the regulation is not applicable to the transactions present in the instant cases. Respondent concedes on brief that the regulations here in question were promulgated "to close an apparently unintended loophole" in the taxation of stock acquired under certain circumstances pursuant to non-statutory stock options, which "loophole" respondent conceives might be considered as having been created by the cases of Harold H. Kuchman, 18 T.C. 154 (1952) and Robert Lehman, 17 T.C. 652 (1951) when those cases are read together. In both of these cases the stock involved, unlike the other stock of the issuing corporation, was issued long after the organization of the corporation, was subject to restrictions imposed by the corporation in the options *87 which were to lapse by their own terms within a certain specified time and which this Court considered to be such as to make it impossible to ascertain the fair market value of the stock so restricted. In the instant cases, unlike the Kuchman and Lehman cases, the restrictions in question applied to all of the stock of the corporation, had been in effect since the corporation was organized, were not imposed by the corporation by the options or otherwise, no provision was made for their lapse, nor does anything suggest that any "lapse" was contemplated. This leads us to the next step in our analysis of the question raised with regard 1219 to the applicability of the regulation. The language of the regulation itself indicates that the Commissioner did not intend it to apply to cases like those before us here. The regulation speaks of a "restriction" which will "lapse," and of the receipt of compensation "at the time such restriction lapses or at the time the property is sold." In all of the four examples set forth by respondent in Regulations section 1.421-6 (d)(2) the restrictions are of a sort which are scheduled to lapse by their own terms at some time in the reasonably *88 foreseeable future, are obviously imposed after the corporation is organized and are intended to apply not to all of the corporate stock during the ineifinite future but to the particular stock acquired by the taxpayer for a time limited by its terms. The purpose of the regulation was to prevent the escape of any taxation under circumstances not present in the instant cases and the language used in the regulation indicates that it was not intended to apply to cases such as those before us. We do not consider that the regulation can or should be considered to apply to a restriction which was imposed upon all of the stock of a corporation at the time of its organization, which had been in effect for over 30 years, which was to continue to adhere to the stock indefinitely without any reasonable ground to anticipate its lapse within the foreseeable future, and which did not make it impossible to ascertain the fair market value of the stock with some degree of certainty. [30]
*89 In our opinion a contrary conclusion would, as a practical matter, lead to undesirable results. For example, if we were to suppose that the regulation would be applicable to shares purchased in 1960 or stock options exercised in 1960 for shares in a closely held corporation with a typical shareholder repurchase agreement or with a buy-sell agreement of indefinite duration in existence since the organization of the corporation in 1925 and that corporation went public or was sold to another corporation in the year 2000, under respondent's regulation the tax, if any, on the shares acquired in 1960 would be deferred until the year 2000 and would be calculated by valuing the stock at a time 40 years prior to the taxable transaction purportedly fixed by the regulation under the hypothetical circumstances that the "restrictions" imposed by the repurchase agreement or the buy-sell agreement did not then exist. Such a result is totally unrelated to the have been intended in 1960 where the employer-corporation sells stock or grants stock options in that year, and particularly if it would have been impossible for the corporation and its shareholders to sustain a public market for the stock *90 of the business at that time. We cannot believe that the respondent would intend the regulation in question to be applied in such circumstances. [31] We are unable to discern any distinction in principle between this hypothetical example and the facts of the cases before us. We also point out that if we were to construe the regulation as being applicable we would be faced with a serious question as to its validity. See Robert Lehman, supra.
We hold that as to the petitioners who were granted the stock options here in controversy taxable events occurred not in 1962 but at the times when they exercised these options. Since it follows from our ultimate findings of fact that the value of the Marsh & McLennan shares on the dates of exercise exceeded the amounts to be paid by those petitioners herein who exercised stock options, *91 the amount of additional income not reported by those petitioners is to be determined in each case by taking the difference between the value and the purchase price of each share under option at the date of exercise and by multiplying this amount by the number of shares acquired. Still another question remains to be decided in these cases: whether the stock purchases on December 27, 1960 by three of the petitioners from other Company stockholders subsequent to the declaration of the 1960 stock dividend were taxable compensatory bargain purchases. [32] The 1220 burden of proving that the three sales here in question were taxable compensatory bargain purchases is upon respondent. In our earlier discussion of the 1960 transactions *92 between the stockholders after the declaration of the 1960 stock dividend, we indicated that Hermon D. Smith, as chief executive officer of the Company, initiated this transaction by making discreet inquiries as to who might be interested in obtaining cash for some purpose and consequently might be willing to sell all or a part of the stock dividends received by them at its Formula Book Value and recommending the proprietors who should be permitted to purchase such stock, all of whom were younger and more active proprietors. Four selling shareholders and eight purchasing shareholders participated in this transaction. In addition, Smith made arrangements for handling the mechanics of this transaction. We also mentioned in our previous discussion that the management of the Company had several motives in encouraging those transactions: by reason of sales to younger proprietors the Formula Repurchase Price payments would, to some extent, be deferred thus protecting working capital; the bonds between the Company and its younger and more active proprietors would be strengthened by increasing as to them the sanction of potential future "run-off" payments on covenants not to compete; and *93 a proper reward would be made to the younger and more active employees for their services. The primary motive of the selling stockholders in making the sales in question was to convert all or a part of the stock dividends just received by them into cash. They were in sympathy with the objectives of the Company's management in suggesting and arranging such sales and felt that the attainment of such objectives would not only be helpful to the Company but would also and as a consequence thereof be beneficial to them as stockholders and potential recipients of "run-off" payments. The secondary motive in making the sales was to assist the Company in obtaining these objectives for the benefit of the Company and of themselves. Because of this secondary motive they were willing to accede to the suggestion that the purchase price of the stock should be in an amount equivalent to its Formula Book Value, particularly in view of the fact that by timing these transactions so that they occurred shortly after a stock dividend had been declared, and by raising the cash dividend so that the dividend paid after the stock dividend on each share would equal the dividend paid as to each share prior to *94 the stock dividend, it was made to appear to the selling shareholders that they would have little to lose by selling their recently received stock dividend shares to other employees at a recent Formula Book Value price as explained in the hypothetical example in our prior discussion of the transactions between stockholders immediately following the 1955 and 1960 stock dividends. In the foregoing resume the facts are stated in a manner as favorable as possible to the petitioners who were buyers in these transactions. However, we cannot avoid the following factual conclusions: that the sales were arranged by the management of the Company for its benefit; that one of the substantial benefits sought on behalf of the corporation was the adequate compensation of its younger and more active officers; that the intent of management was to accomplish such additional compensation by arranging for the sales to be at bargain prices; that the sales were made at bargain prices; that one of the principal reasons for the purchase of this stock by the buyers was that they could get it at a price less than its fair market value; and that it was intended by the management of the Company and understood *95 by the purchasing stockholders that the exercise of this privilege should constitute partial compensation for their services. Accordingly even though the sales in these cases were not by controlling stockholders of the Company or at prices less in a shocking amount than the fair market values of the securities sold, as in Van Dusen v. Commissioner, 166 F.2d 647 (C.A. 9, 1948) affirming 8 T.C. 388 (1946), and Knowles v. Commissioner, 355 F.2d 931 (C.A. 6, 1966), affirming per curiam a Memorandum Opinion of this Court, cited by respondent, it is our opinion that they are similar in principle and are persuasive of a conclusion that as to the buyers in these cases, who are the 1221 taxpayer-petitioners, the transactions were intended to be, are, and should be taxed to them as compensatory bargain sales. The cases of Oliver R. Aspegren, Jr., 51 T.C. 945 (1969) and James M. Hunley, T.C. Memo. 1966-66, 25 T.C.M. (CCH) 355, cited by petitioners are distinguishable on their facts. We have determined that each of the petitioners *96 herein received taxable income in 1960 or 1961, and not 1962. The determination of the amount of such taxable income omitted by each petitioner from his return shall be made under Rule 50. [33] It can then be ascertained whether a petitioner has omitted from the income reported in his return for either year an amount exceeding 25% of the income reported and, consequently, whether the period of limitations on the assessment and collection has expired as to that petitioner. Section 6501(e). Decisions will be entered for the petitioners in docket Nos. 3215-67, 3216-67 and 3218-67. Decisions will be entered under Rule 50 in docket Nos. 6647-66 thru 6658-66, 2544-67 and 6712-66. *97 Footnotes
1. Cases of the following petitioners are consolidated herewith: Muscoe R. H. Garnett and Helene W. Garnett, docket Nos. 6648-66 and 2544-67; Estate of Irwin E. Houck, Deceased, Margaret L. Houck and Continental Illinois National Bank and Trust Company of Chicago, Co-Executors, docket No. 6649-66; Estate of Ralph C. James, Dec'd, Ralph S. McFarland and LaSalle National Bank, Co-Executors, and Helen L. James, docket No. 6650-66; Harvey K. Moore and Mary S. Moore, docket No. 6651-66; Albert A. Morey and Margaret L. Morey, docket No. 6652-66; Conrad A. Orloff and Shirley M. Orloff, docket No. 6653-66; John M. Regan, Jr. and Prudence S. Regan, docket No. 6654-66; Gilbert S. Sinnott, Jr. and Mary C. Sinnott, docket No. 6655-66; Wilson D. Sked and Isabel G. Sked, docket No. 6656-66; Hermon Dunlap Smith and Ellen Thorne Smith, docket No. 6657-66; William F. Souder, Jr. and the Estate of Marguerite D. Souder, Dec'd, William F. Souder, Jr., Administrator, docket No. 6658-66; George H. Watkins and Catherine P. Watkins, docket No. 6712-66; Joseph W. Hoagland and Mabel B. Hoagland, docket No. 3215-67; James T. Leftwich, III and Carol C. Leftwich, docket No. 3216-67; and Francis A. Nelson, Jr. and Elizabeth L. Nelson, docket No. 3218-67. In docket No. 6649-66, the petition originally filed named Irving E. Houck and Margaret L. Houck as petitioners in that case. Mr. Houck died on April 28, 1970, and we have granted a motion to substitute his estate as a party therein.↩
2. On frequent occasions, and with the approval of the Marsh & McLennan board of directors, employee shareholders would transfer some of their shares to members of their families or trusts for the benefit of family members.↩
3. Alternative deficiency determinations have not been made with respect to petitioners Hoagland, docket No. 3215-67; Leftwich, docket No. 3216-67; and Nelson, docket No. 3218-67. With respect to petitioner Garnett the alternative deficiency determinations have been made the subject of two separate actions which are now before us under two docket numbers. ↩
4. Hereafter, all section references are to the Internal Revenue Code, as amended on the date this opinion is filed, unless otherwise indicated.↩
5. No contention is made by either party that the fair market value of the stock in 1962 when the Stockholders Agreement and Voting Trust were terminated was lower than in 1960 and 1961.↩
6. This issue does not exist in Garnett, docket No. 2544-67; Hoagland, docket No. 3215-67; Leftwich, docket No. 3216-67; and Nelson, docket No. 3218-67.↩
7. In a few instances it was also owned by or on behalf of members of their families. See footnote 2, supra.↩
8. A slight modification of the September 20, 1957 Stockholders Agreement was made by means of an amendment dated May 29, 1959. ↩
9. If a Proprietor sells stock to a Transferee who is a director, officer or employee of the Company or its subsidiary, that Transferee may be designated a Proprietor.↩
10. If a Transferee acquired stock by gift, the repurchase option price payable by the Proprietor was to be the most recent price at which other similar shares were purchased by Proprietors from the Company.↩
11. The original Stockholders Agreement of March 23, 1923 provided a Formula Repurchase Price of book value per share, unadjusted, plus a run-off of 55% of net income, adjusted, attributable to purchased shares for the succeeding five years. Later agreements and amendments established additional adjustments to book value and net income, added the lump sum purchase option, reduced the net income percentage from 55% to 50% (1933) and lengthened the run-off period first to eight years (1933) and then to 10 years (1952).↩
12. The lines marked with an asterisk contain data stipulated by the parties, with certain exceptions explained below. The Company's balance sheets for the years ended December 31, 1951, and December 31, 1961, and its statements of income for the year ended December 31, 1951, and the three years ended December 31, 1961, have been audited by independent accountants. Audited data are indicated by the symbol "(A)". Large cash figures have been rounded into thousands of dollars. The balance sheet and income data include the Company and its wholly owned United States and Canadian subsidiaries on a consolidated basis. The Company's share of income from its operations of Marsh & McLennan-Cosgrove & Company, Inc. (mentioned hereafter in our Findings of Fact) is included in the statements of income for 1956-1958, which was the period prior to its becoming a member of the affiliated group. In the "unaudited" years, certain other adjustments have been made to the Company's income statements to reflect, for purposes of comparability, adjustments which were made in the "audited" years by the Company's independent accountants. The Formula Book Value and Formula Net Income data were offered into evidence by petitioners. Respondent did not object to the admission into evidence of these data; however, respondent contends that certain adjustments required by the Stockholders Agreement in calculating these data were not made. Petitioners have offered no evidence to show what adjustments were made to the Company's net income figures in any given year in calculating any of the Formula Net Income amounts shown. However petitioners introduced photostatic copies of calculations of Formula Book Value with respect to certain years which were prepared when the consolidated balance sheets were prepared for those years. The Formula Book Value amount stated on one such photostatic copy of a year-end calculation of Formula Book Value has been used rather than the amount stated in some of petitioners' other exhibits in the one instance, on December 31, 1957, when the amount calculated at year-end conflicted with the amount shown on petitioners' other exhibits.↩
*. Data stipulated by the parties. ↩
i. Including shares repurchased, but not yet received, from terminated shareholders: 1960--28,375.↩
A. Audited data. ↩
ii. Prior to 1961 the Company generally did not maintain a reserve to cover its total anticipated obligation for payments of Formula Repurchase Price to former stockholders, nor did the Company reflect as an asset its investments in subsidiaries which exceeded its equity in the subsidiaries' net assets. In the course of preparing its registration statement, to be filed with the Securities and Exchange Commission prior to the public offering of its stock in 1962, the Company showed on its December 31, 1961 consolidated balance sheet, as liabilities, "Current pr portion of estimated liability to former stockholders" of $2,700,000 and "Reserve for liability under stockholders agreement" of $6,000,000. The Company showed as an asset "Unamortized excess of cost over underlying book value of net assets of subsidiaries at date of acquisition" of $3,196,000--an amount to be amortized on a straight line basis by charges to income over a period of 20 years. No such adjustments were made by the Company in calculating Formula Book Value.↩
iii. See footnote 12.↩
13. The record does not disclose whether Marsh retained and enjoyed rights to receive "run-off" payments with respect to these shares.↩
1. On the same date, two other Company officers bought 11,270 shares from the Company for $10.00 per share. ↩
*. Event of termination. ↩
2. The Company's board of directors decided the 170,300 shares of the Company held by the estate of D. R. McLennan, Sr. could be disposed of as follows: 100,000 shares could be sold to the Company for a lump sum price of $15.00 per share: 60,330 shares could be old to the Company 10,000 shares could be sold to D. R. McLennan, Jr. for a lump sum price of $15.00 per share. The price of $15.00 per share was a negotiated price. The Company considered the price to at Formula Repurchase Price under the Stockholders Agreement (this was not done); and 10,000 shares could be sold to D.R. McLennan, Jr. for a be advantageous, and the estate of D. R. McLennan, Sr. considered both the price, and the lump sum payment advantageous in settling the estate's affairs. At the time of D. R. McLennan, Sr.'s "event of termination," his death on October 14, 1944, the "run-off" portion of the Formula Repurchase Price was payable over a period of eight years. ↩
3. This per-share price was a negotiated figure for the purpose of exchanging stock in the Transatlantic transaction, described below, which included a figure representing discounted value of "run-off."↩
1. On petitioners' Exhibit 12, not stipulated by the parties, petitioners state that the sales prices in the 7/5/55 and 1/27/56 transactions were based on a Formula Book Value per share of $15.05 calculated as of March 31, 1955. However, Exhibit 41, a calculation of Formula Book Value on various dates in 1955 prepared by petitioners' comptroller, indicates that Formula Book Value on March 31, 1955 was calculated to be $14.29 per share and Formula Book Value on June 30, 1955 was calculated to be $14.99 per share, prior to adjustments, apparently made not earlier than December 1955, which reflected the repeal on June 15, 1955 of section 462 of the Internal Revenue Code of 1954↩. Another exhibit not stipulated by the parties, respondent's Exhibit D, consists of a memorandum dated May 26, 1955 and a letter dated June 27, 1955 which discuss transactions in the Company's stock at a price of $15.00 per share.
14. A selling shareholder who sold his entire stock dividend but retained the stock with respect to which the stock dividend was paid, would retain the same interest in the "run-off" payments after his "event of termination" as he would have had if neither the dividend nor the sale had taken place since the "run-off" payments were determined by the ratio of shares sold back to the Company at termination to all issued shares, rather than outstanding shares, and since no additional shares were issued by the Company in connection with the 1955 and 1960 stock dividends.↩
15. The Formula Book Value figure used in this transaction appears to be $19.83 per share, Formula Book Value as calculated on May 31, 1957. Marsh & McLennan's comptroller testified that he thought the Formula Book Value figure used in this transaction was $23.38, Formula Book Value as of December 31, 1957, but he also indicated in his testimony that he did not recall with certainty the exact figure used or the date with respect to which it was calculated. One of the stipulated exhibits is a letter from Marsh & McLennan addressed to Donald R. McLennan, Jr. stating the terms of the Marsh & McLennan-Transatlantic share exchange. That letter is dated December 23, 1957, eight days prior to the December 31, 1957 valuation. Another stipulated exhibit is a letter bearing the same date from Marsh & McLennan addressed to Sandacres Associates and describing the terms of the Marsh & McLennan-Transatlantic share exchange with Sandacres Associates. It was agreed, as a term of that exchange, that the Marsh & McLennan stock was to be valued at $19.83 per share, Formula Book Value on May 31, 1957. Also, in the valuation report of one of petitioners' expert witnesses the following statement is made: "The remaining 29.5% of the Transatlantic stock was transferred to Donald R. McLennan, Jr. in exchange for 18,884 shares of Marsh & McLennan stock valued at $36 per share which was $16.17 per share in excess of the book value." This obviously assumed a Formula Book Value of $19.83.↩
16. The 1962 income tax returns of petitioners Orloff and Smith, offered into evidence as joint exhibits of each petitioner and the respondent, indicate that certain Marsh & McLennan stock sold during that year subsequent to the date of the public offering was acquired by each of these petitioners on December 27, 1960, in the 1960 transactions between stockholders here at issue (although in petitioner Smith's 1962 return the date of acquisition of these shares is mistakenly referred to as "11/27/60").↩
17. Internal Revenue agent John J. Marshall began auditing the 1961 income tax return of petitioner Smith in January 1965. In February or March he learned about the other 1959, 1960 and 1961 stock acquisitions, including those here at issue, and about the 1962 public offering of the Company's stock. By June or July, 1965, he had been assigned the returns of a number of the Company's officers. After gathering some information bearing on the stock acquisitions, in October or November, 1965, Marshall began his research to determine the income tax consequences arising from the acquisitions. About February 1966, he requested, through Internal Revenue Service channels, expert assistance in valuing the Marsh & McLennan stock. Herman Kelting, an engineer revenue agent who was assigned the task did not start work on the matter until May or June, 1966. The officers under examination, represented by counsel for petitioners herein, had extended the statute of limitations on assessment of deficiencies until September 30, 1966. Marshall was told by Kelting that he would be unable to complete his valuation report before that date. Several of the officers were unwilling to extend the limitations period beyond that date unless assured that a 30-day letter of proposed adjustment would be issued. Because of the administrative steps involved in the issuance of 30-day letters, Marshall indicated to petitioners' counsel that administrative practice forclosed that possibility and, on August 30, 1966, petitioners' counsel informed Marshall that these officers would not consent to a further extension of the limitations period. During September 1966, agent Marshall wrote reports on the basis of which respondent issued the statutory notices involved in these proceedings, most of which were sent at the end of that month. The determination of the fair market value of Marsh & McLennan stock was the last thing agent Marshall did in writing his reports. While Kelting had not finished his valuation report, he did tell Marshall that he thought his report would show that the value (with restrictions) was $60 per share in 1959. On this basis (since Kelting did not give him any estimate of 1960 or 1961 values) Marshall derived his own 1960 and 1961 values (with restrictions) by adding 5 percent per year (based upon a growth rate figure he had seen in a Marsh & McLennan report) to Kelting's 1959 value ($60) and rounding the product up to the next $5 increment - $65 for 1960 and $70 for 1961. Kelting did not provide Marshall with any values in Marsh & McLennan stock without restrictions. In order to determine the fair market value of Marsh & McLennan stock as if it had been without restrictions in 1960 and 1961, for the purpose of computing the 1962 deficiencies, agent Marshall (and respondent in the statutory notices) took the March 20, 1962 public offering price of the stock ($44.50 per share) and discounted it back to 1961 or 1960, using the same 5 percent annual growth factor rate he had used in projecting Kelting's 1959 with restrictions value into 1960 and 1961. He then multiplied the per-share values obtained either by 5 (to adjust for the 5-for-1 split that preceded the public offering) or by 6 (to adjust both for the 5-for-1 stock split and for a 20 percent stock dividend paid on December 20, 1960) which applied to some of the shares being valued.↩
18. It is noted that petitioners make no contention that the interplay of Robert Lehman, 17 T.C. 652 (1951) and Harold H. Kuchman, 18 T.C. 154↩ (1952) requires a conclusion that no taxable event occurred in any of the years before us and that no income can be considered as realized by any of the purchasers of the stock regardless of the spread between cost and fair market value.
4. Williams did alternative valuations on the basis of (1) the 10-year run-off and (2) the 5-year retrospective methods of determining the formula Net Income portion of the Formula Repurchase Price. However, since the Company had never used the 5-year retrospective method and none of the other experts relied on a valuation on that basis, it will be ignored throughout this discussion. ↩
1. The precise dates in these months on which the experts valued Marsh & McLennan stock differed because petitioners' experts used the dates on which options were granted (the appropriate date for determining whether the option price was at least 85% of fair market value and, therefore, whether the options were statutory Restricted Stock Options); whereas respondent's experts used the dates on which options were exercised (the appropriate date for determining the taxable spread, if any, between option price and fair market value if these were not Restricted Stock Options and if Reg. sec. 1.421-6(d)(2)↩ was not applicable). However, for purposes of analysis, the values on the grant and exercise dates (within the same month) are comparable. 2. The Statutory Notice Values were computed by Agent Marshall on the basis of Engineer Revenue Agent Kelting's preliminary estimate of 1959 value. ↩
3. Kelting was not offered by Respondent as an expert witness at trial, but his final report is in evidence. ↩
5. For some reason not explained in their reports or testimony, neither of respondent's experts valued the stock acquired by three of the petitioners from other officers on 12/27/60.↩
1. The precise dates in these months on which the experts valued Marsh & McLennan stock differed because petitioners' experts used the dates on which options were exercised (the appropriate date under Reg. sec. 1.421-6(d)(2)↩); whereas respondent's experts, for some reason, used the dates on which options were granted. However, for purposes of analysis, the values on the grant and exercise dates (within the same month) are comparable. 2. The Statutory Notice Values were computed by Agent Marshall by discounting back the March, 1962, public offering price at 5% per year. ↩
3. Williams valued the stock using three different methods of valuation. ↩
4. For some reason, not explained in their reports or testimony, neither of respondent's experts valued the stock acquired by three of the petitioners from other officers on 12/27/60.↩
19. During 1960 and 1961, the taxable years in which the stock options here in question were granted, statutory "restricted stock options" were defined in section 421. Pertinent portions of that section state as follows: SEC. 421. EMPLOYEE STOCK OPTIONS. (a) Treatment of Restricted Stock Options.- If a share of stock is transferred to an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him - (1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share; (2) no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which subsection (g) is applicable, with respect to the share so transferred; and (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred. * * * (d) Definitions. - For purposes of this section - (1) Restricted Stock Option. - The term "restricted stock option" means an option granted after February 26, 1945, to an individual, for any reason, connected with his employment by a corporation, if granted by the employer corporation or its parent or subsidiary corporation, to purchase stock of any of such corporations, but only if - (A) at the time such option is granted - (i) the option price is at least 85 percent of the fair market value of the stock subject to the option, or * * *.↩
20. At the same time, Donald R. McLennan, Jr. purchased 10,000 shares from his father's estate at the same price to be paid by the Company. ↩
21. Certain transactions in smaller amounts of shares took place between officers in 1946 and 1956. The 1946 sales were made by Charles W. Seabury, chief officer and sole voting trustee of the Company, mostly to officers who previously owned no stock in the Company, at the Formula Book Value as "frozen" at its October 31, 1945 value. The 1956 sales were made by Donald R. McLennan, Jr., to officers who previously owned no stock in the Company at or near Formula Book Value amounts established somewhat prior to the sales dates. The minutes of the meetings of the Company's board of directors, stipulated into evidence, in which the Company waived its rights to repurchase these shares, are unenlightening as to the circumstances surrounding these transactions. Later McLennan, Jr. exchanged more of his Marsh & McLennan stock for Transatlantic stock in the Transatlantic transaction. Subsequent to his 1956 sales, and until the public offering, McLennan, Jr. never purchased additional Company stock. Little mention was made of McLennan, Jr. at the trial of these cases, except as to his participation in the Transatlantic transaction. McLennan, Jr. is named in the Company's prospectus, prepared in connection with the 1962 public offering and stipulated into evidence, as a director and senior vice president of the Company. He is the only such person named in that prospectus who is not also named among the Company's most highly compensated officers. At the trial, petitioner Albert A. Morey testified that "a senior vice president was more or less an honorary title which the directors * * * give to the vice president who had been made a member of the board of directors. In view of these facts, we tend to believe that these smaller transactions were strongly motivated by factors other than those which normally motivate a buyer and a seller engaged in arm's-length bargaining.↩
22. We note that as to the Cosgrove transaction, It was in the interest of the Company to place a high value on its stock, since it was to the Company's advantage to acquire the Cosgrove group's interest in Marsh & McLennan-Cosgrove & Company, Inc., in exchange for as few Marsh & McLennan shares as might be possible. ↩
23. Petitioners argue that the Transatlantic shares at the time of this transaction were worth less than their book value and, in that respect, were similar to other publicly traded reinsurance companies whose shares were publicly traded at an amount less than their book value. However we note that other employees of Marsh & McLennan were willing to purchase, for cold cash, 4,000 shares of Transatlantic for an amount equivalent to its book value. ↩
24. Petitioners introduced certain testimony to the effect that, in the mind of the Marsh & McLennan negotiators during this transaction, the discounted value of the "runoff" portion of the Formula Repurchase Price exceeded the difference between $41.29 and $26.69 per share. However we are satisfied that the $41.29 per share value placed on the Marsh & McLennan shares after these negotiations reflected all of the elements of value attributable to these shares.↩
25. Marsh & McLennan actually had 540,000 issued shares from early 1953 until early 1962. ↩
26. This would in fact occur when the Company would buy back its shares from shareholders who reached an "event of termination" and not resell those shares.↩
27. In the cited case a preliminary registration statement under the Securities Act of 1933 was filed with the Securities and Exchange Commission two weeks after the first of the valuation dates at issue in that case.↩
28. The regulation appeared as section 1.421-6 (c)(2) in T.D. 6416, supra. It has not been amended in a manner significant to the instant cases since it was promulgated in 1959. However the regulation was renumbered as section 1.421-6(d)(2) in T.D. 6540, 1961-1 C.B. 161 (filed January 19, 1961) when a new subsection (c) was added to section 1.421-6 of the regulations. At all times when we refer to this regulation in this Opinion, we refer to it as section 1.421-6(d)(2)↩ - as it presently is numbered in respondent's regulations.
29. We have found as a fact that none of the petitioners sold the stock here in question prior to March 20, 1962, the date of the public offering. Hence, in none of these cases was the stock sold prior to the termination of the Voting Trust and Stockholders Agreement.↩
30. Since we conclude that the "lapse" of the Stockholders Agreement and the Voting Trust were not to be anticipated at the time of the exercise of the stock options and the stock purchases here at issue, we reject respondent's contention that the "open transaction" doctrine first set forth in Burnet v. Logan, 283 U.S. 404, 75 L. Ed. 1143, 51 S. Ct. 550↩ (1931), supports either his asserted 1962 deficiencies or the applicability of Reg. 1.421-6(d)(2) to the instant cases.
31. The facts presented in the hypothetical example stated in the body of this opinion may not be considered remote from the facts before us when it is recalled that Marsh & McLennan was first incorporated in 1923, and from that time until 1962 the stock of that Company had been subject to a Voting Trust and a Stockholders Agreement.↩
32. We understand respondent to have conceded this issue in connection with the direct purchase from the Company of 500 of its shares by petitioner Souder, because even if the fair market value of these shares was found to be $70 per share, the maximum value for which respondent contends the increase in Souder's gross income in 1961 would be insufficient to satisfy the 25 percent test of the six year statute of limitations under section 6501(e)(1) (A)↩.
33. No Rule 50 computations are necessary in three of the four cases arising from deficiencies determined only as to the year 1962. In the separate action brought by petitioner Garnett with respect to alleged 1962 deficiencies, docket No. 2544-67, a Rule 50 computation will be necessary to reflect concessions by the parties. In the cases of petitioners Orloff and Smith, the Rule 50 computation as to 1962 should reflect adjustments to the basis of stock acquired on December 27, 1960 and sold in 1962.↩